**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LORI OSTENFELD, DEBORAH GESCHWIND, and JUDY STILWILL, individually and on behalf of all others similarly situated, | Case No.: 1:22-cv-10677-JMF<br>Lead Case: 1:22-cv-10008-JMF |
| Plaintiffs, | |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| THE LAUNDRESS, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs Lori Ostenfeld, Deborah Geschwind, and Judy Stilwill ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their attorneys, allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on their personal knowledge:

## NATURE OF THE ACTION

1.  This action seeks to remedy personal injuries caused when Defendant The Laundress, LLC ("Laundress" or "Defendant") manufactured, marketed, and sold defective cleaning products ("Products")[1] that were contaminated with bacteria, including *Burkholderia cepacia* complex, *Klebsiella aerogenes* and multiple different species of *Pseudomonas*.

---

[1] "Product(s)" include but are not limited to All Purpose Bleach Alternative & Cleaning, All Purpose Cleaning Concentrate, Aromatherapy Associates Support Breathe Dish Detergent, Aromatherapy Associates Support Breathe Surface Cleaner, Baby Detergent, Delicate Lady Wash, Dish Detergent, Fabric Conditioner Baby, Fresh Wash Signature Detergent, Glass & Mirror Cleaner, Home Cleaning Starter Kit, Kitchen Clean Duo, Pet Mess Kit, Signature Detergent & Fabric Conditioner, Stain Removal Essentials, Surface Cleaner, Whites Detergent, Wool & Cashmere Shampoo & Wool & Cashmere Spray. According to the recalled Product list provided by Defendant, over 250 products manufactured, distributed and/or sold by Defendant can be contaminated with *Burkholderia cepacia* complex, *Klebsiella aerogenes* and multiple different species of *Pseudomonas*. *See* https://www.thelaundressrecall.com/_files/ugd/b51df1_730f72b3535e49cdad3ac8f4c2d895c7.pdf.

2.     As detailed below, since at least January 2021, the Products contained various bacteria that can cause serious and life-threatening adverse health issues. The risk of serious infection and even death is particularly concerning for immunocompromised individuals who are highly susceptible to life threatening diseases and death from the bacteria contamination because their immune systems are compromised or entirely absent.

3.     Until mid-November 2022, Defendant failed to disclose that the Products contained highly dangerous bacteria or were at unreasonable risk of containing highly dangerous bacteria even though Defendant knew of that risk long before November 2022 due to consumer injury reports; its sophistication and top position in the cleaning product market as a seller of premium cleaning products; the substantial length of the contamination (at least from January 2021 until September 2022); and the enormous number of Products impacted (8 million units). On December 1, 2022 and December 27, 2022, Defendant ultimately recalled all existing Products even though Defendant suggested that the bacterial contamination only impacts Products produced between January 2021 and September 2022.

4.     From at least January 2021 until mid-November 2022, Defendant failed to disclose and actively concealed the risk of bacterial contamination to prevent a nosedive in sales and protect its existence as a going concern. Defendant failed to disclose and actively concealed the known risk of bacterial contamination even though it had exclusive knowledge of the risk of bacterial contamination (including from consumer reports of injury) and understood that consumers, including Plaintiffs, depended on truthful disclosures to make their purchasing decisions and would not purchase or use products contaminated with bacteria or at unreasonable risk of bacterial contamination. Defendant did not disclose the bacterial contamination and/or risk of bacterial contamination because it understood that a catastrophic design and/or manufacturing defect in the Products rendered the Products nonmerchantable and that disclosing the risk of

bacterial contamination would halt or jeopardize its existence. Four months after it revealed the truth, Defendant has still not resumed production of the Products and has given no definitive timeline for restarting production of the Products.

5.     During the Class Period (defined below), Defendant misleadingly represented on Product labels that the Products were "Nontoxic, biodegradable, and allergen-free" when the Products were at unreasonable risk of, or were contaminated with, a highly toxic cocktail of bacteria that could severely injury consumers or worse, including *Burkholderia cepacia* complex, *Klebsiella aerogenes*, and multiple different species of *Pseudomonas.* Defendant also universally presented and positioned itself as a manufacturer, distributer, and/or seller of luxury cleaning products that were non-toxic, better for the environment, and cruelty-free when Defendant understood that the Products were contaminated with toxic bacteria and/or at an unreasonable risk of toxic bacterial contamination due to systemic and readily apparent Product design and manufacturing defects.

6.     From at least January 2021 until November 2022, Defendant marketed and sold the Products when Defendant understood that the Products were contaminated with bacteria or at unreasonable risk of bacterial contamination due to systemic and readily apparent Product defects, including design, manufacturing, warning and/or instruction defects. Defendant placed eight (8) million contaminated products into the stream of commerce, placing millions of individuals including Plaintiffs at substantial risk of bacterial infection and even death. Defendant's misconduct presented a substantial and unjustifiable risk of injury to consumers and provided no countervailing benefit to consumers considering the severe risk of personal injury and death.

7.     In November and December 2022, Defendant finally admitted the risk of bacterial contamination and that eleven (11) consumers had reported *Pseudomonas* infections potentially connected to the Products. Upon information and belief, Defendant made those admissions due

Case 1:22-cv-10008-JMF   Document 52   Filed 03/22/23   Page 4 of 51

to accumulating consumer injury reports; intervention by the Consumer Product Safety Commission ("CSPC") or other regulatory entities; and/or because Defendant knew that its competitors (The Clorox Company; Colgate-Palmolive; and AlEn USA, LLC) had already disclosed or were soon going to disclose and recall cleaning and laundry products based on the risk of *Pseudomonas aeruginosa* and other bacterial contamination. The timing of these recalls along with the involvement of the CPSC cannot be a coincidence. Instead, in November and December 2022, Defendant must have decided to disclose the risk of bacterial contamination to avoid the severe consequences stemming from consciously disregarding that risk and continuing to sell adulterated and unreasonably dangerous Products.

8.     During the Class Period, Plaintiffs purchased Products that Defendant later and untimely identified as being at risk of bacterial contamination, including contamination by *Burkholderia cepacia* complex, *Klebsiella aerogenes*, and multiple different species of *Pseudomonas*.[2]

9.     Plaintiffs purchased the Products based on Defendant's false and misleading representations that it sold non-toxic, natural, and environmentally friendly and cruelty-free premium Products, a misrepresentation or a misleading partial truth given that the Products contained, or were at unreasonable risk of containing, highly dangerous and toxic bacteria. Moreover, the Products did not disclose the risk of bacterial contamination; did not disclose that the Products contained bacteria (in the ingredient section or otherwise); and provided no warnings or instructions regarding the risk of bacterial contamination, the presence of bacteria, or the signs of, and what do if a user suspected, an infection.

10.     When Plaintiffs and the Class Members purchased and used the Products, they reviewed the inadequate Product labeling and instructions and relied on Defendant's

---

[2] "Class Period" means the applicable statutes of limitations for Plaintiffs' claims.

misrepresentations and omissions about the Products, including misleading and incomplete representations that the Products were "non-toxic" and omissions regarding the presence or unreasonable risk of bacterial contamination.

11.     Plaintiffs suffered injuries after purchasing and using the Products. Plaintiff Ostenfeld suffered respiratory injuries for over a year as well as skin injuries after purchasing and using the Products. Likewise, Plaintiff Stilwill suffered increasingly worse sinus congestion and infections that could not be treated with antibiotics, ultimately requiring surgery to drain the infection, which her doctor cultured and identified as *Pseudomonas aeruginosa.* And although she has not definitively suffered a physical injury at this time, Plaintiff Geschwind suffered economic injury by purchasing worthless Products that were contaminated with dangerous bacteria and by remediating a potential bacterial contamination in her home (including disposing of hundreds of dollars' worth of storage containers, hangers, and other potentially contaminated property).

12.     Plaintiffs and other consumers reasonably relied on Defendant to sell products that are safe and free from harmful known substances, including *Pseudomonas* and other harmful bacteria, and to inform and warn about Product dangers promptly and clearly. Plaintiffs and other consumers would not have purchased and used the Products and would not have suffered physical injuries had Defendant disclosed the risk that the Products were contaminated with dangerous bacteria. Consequently, Plaintiffs and the Class Members suffered injuries and damages due to Defendant's unreasonably dangerous, deceptive, and unfair business practices.

13.     Based on Defendant's misconduct, Plaintiffs bring claims against Defendant for: Violation of NY GBL §§ 349-50 (Count 1); Strict Products Liability—Design Defect (Count 2); Strict Products Liability—Manufacturing Defect (Count 3); and Strict Products Liability—Failure to Warn (Count 4).

14.     Plaintiffs bring their claims on behalf of themselves and two classes of similarly situated individuals. Plaintiffs bring claims on behalf of a national class of individuals who purchased Products during the Class Period ("Economic Injury Class"). Plaintiffs Ostenfeld and Stilwill bring claims on behalf of a national class of individuals who suffered physical injuries after using Products during the Class Period ("Physical Injury Class") (together with the Economic Injury Class, "Classes").

## PARTIES

A.     **Plaintiffs**

15.     Plaintiff Ostenfeld is, and was at all relevant times, a resident of New Jersey. Plaintiff Ostenfeld purchased recalled Products during the Class Period; reviewed the labeling and used the Products as directed in the instructions without any knowledge that the Products contained *Pseudomonas* and other dangerous bacteria; and suffered physical injury. Plaintiff Ostenfeld would not have purchased the Products and would not have suffered physical injury had she known that they were contaminated.

16.     Plaintiff Geschwind is, and was at all relevant times, a resident of New York. Plaintiff Geschwind purchased recalled Products during the Class Period; reviewed the labeling and used the Products as directed in the instructions without any knowledge that the Products contained *Pseudomonas* and other dangerous bacteria. Plaintiff Geschwind would not have purchased the Products had she known that they were contaminated.

17.     Plaintiff Stilwill is, and was at all relevant times, a resident of Nebraska. Plaintiff Stilwill purchased recalled Products during the Class Period; reviewed the labeling and used the Products as directed in the instructions without any knowledge that the Products contained *Pseudomonas* and other dangerous bacteria; and suffered physical injury. Plaintiff Stilwill would

not have purchased the Products and would not have suffered physical injury had she known that they were contaminated.

**B.    Defendant**

18.    Defendant Laundress is a Delaware corporation with its principal place of business at 199 Prince Street, New York, New York 10012 and/or 247 West 30th Street, New York, New York 10001. When acquiring Defendant in 2019, Unilever United States, Inc. stated "[Defendant] will continue to operate from their New York City headquarters with the co-founders remaining in place to lead the business and their NYC Flagship store in Soho." From its New York headquarters in this District, Defendant and its management oversaw the production, distribution, and sale of the Products throughout the United States.

19.    Defendant's sales and marketing leadership, as well as its accounting, financial, and legal departments, are all based in its New York headquarters in this District. Furthermore, upon information and belief, Defendant's marketing, marketing analysis, and sales and financial documents were created and are located at its New York headquarters in this District.

20.    Defendant and its management—from its New York headquarters—collaborated in developing, manufacturing, and distributing the Products, and the December 2022 recalls of the Products, with the Products' labeling uniformly stating "New York" under Defendant's name. Upon information and belief, Defendant created and/or authorized the false and misleading representations and omissions from New York.

21.    Defendant's participation in designing, manufacturing, packaging, distributing and selling the Products from its New York headquarters means New York has the greatest interest in the subject matter of this lawsuit.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Minimal diversity exists between members of the proposed Class and Defendant: Defendant is a citizen of New York and Delaware, and Plaintiffs are citizens of New York, New Jersey, and Nebraska. The amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Classes.

23.     This Court also has original jurisdiction under 28 U.S.C. 1332(a) over Plaintiffs Ostenfeld and Stillwill's claims. Complete diversity exists between Plaintiffs Ostenfeld and Stilwill and Defendant: Laundress is a citizen of New York and Delaware, and Plaintiffs Ostenfeld and Stilwill are citizens of New Jersey and Nebraska. The amount in controversy exceeds $75,000, exclusive of interest and costs, for Plaintiff Ostenfeld and Stilwill's claims, individually.

24.     This Court has personal jurisdiction over this case. Defendant's principal place of business is in New York, and/or Defendant is engaged in systematic and continuous business activity in New York, has sufficient minimum contacts in New York, or otherwise intentionally avails itself of the New York consumer market.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendant's principal place of business is located in this District, and a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including oversight of the production, distribution, and sale of the contaminated Products.

## FACTUAL BACKGROUND

**A.     Defendant,  the  Products,  Universal  "Non-Toxic"  Product  Branding, Misrepresentations and Omissions**

26.     Defendant manufactures, distributes, and sells the Products throughout the United States and globally.

27.     Defendant was founded by Gwen Whiting and Lindsey Boyd, New York fashion executives who "set out to revolutionize laundry." On its website, Defendant claims it "introduce[ed] a pioneering collection of fabric-specific scented products with sophisticated fragrances that extend the lifespan of clothing and eliminate the chemicals and cost of dry-cleaning."

28.     Defendant sets itself apart in the competitive cleaning and laundry product market through a widespread and consistent marketing campaign emphasizing purported non-toxic, eco-friendly, and green cleaning products that do not contain, or contain minimal, chemicals and allergens, including on labeling which identifies the Products as "Non-toxic, biodegradable, and allergen-free":



29.     On its website, Defendant touts its products as a non-toxic, safer alternative to dry

cleaning:

> Dry clean only? No way. You've got this, and we can help. Nobody
> relishes the idea of wearing highly toxic drycleaning chemicals
> against their skin along with their most delicate clothing items. Now
> there's a solution that is better for both you and the environment, all
> without ruining your treasured delicates. Washing delicates is easier
> than ever with Delicate Wash from The Laundress. It smells divine
> and easily removes odors while cleaning and preserving delicate
> fabrics. Visit our Clean Talk Blog for instructions on how to wash
> specific delicate items.

\*\*\*

> Of course, your delicates are not usually the items to wear once and toss in the laundry. If you want to stay fresh between washing delicate items, try our non-toxic, biodegradable, and delightfully fragrant Delicate Spray. It's perfect for silks, knits, and undergarments. So keep that favorite silk Hermes scarf in the rotation a bit longer before your next hand-washing adventure. This fabric spray makes a great gift, too. You can even use it to freshen bed linens, pillows, and furniture around the house. Herbal and citrus notes combine with amber, bergamot, lavender, and musk to make everyone's nose a little happier.[3]

30.    In January 2019, Unilever United States, Inc acquired Defendant for $100 million, stating:

> Founded in 2004 by textile and fabric care experts Gwen Whiting and Lindsey Boyd, The Laundress is dedicated to turning necessary household chores into a luxurious and enjoyable experience. Having started with a single product, the Wool and Cashmere Shampoo, the brand's mission is vested in returning the lost art of laundry care. The Laundress portfolio now comprises 85 eco-friendly products across Laundry and Home Cleaning, which expands Unilever's portfolio in the growing top end of the Home Care market and fits greatly with Unilever's Sustainable Living Plan.
>
> \*\*\*
>
> Kees Kruythoff, President of Unilever's Home Care business said: "With its line of beautifully crafted eco-friendly products and fast-growing following in the US and China, particularly among millennials, The Laundress is a strong addition to our portfolio of leading Home Care brands. Its distribution network across specialty retailers, direct-to-consumer and e-commerce, combined with Unilever's global reach creates an ideal launch pad towards giving more people around the world the distinct 'The Laundress' experience".
>
> Gwen Whiting, co-founder of The Laundress said: "During our careers in the fashion industry, we grew frustrated with dingy white T-shirts, ineffective cleaning products, and items ruined by the dry cleaners. We set out to create our own alternatives, producing a highly effective, non-toxic line of fabric care and home cleaning products."

---

[3] https://web.archive.org/web/20221202031620/https://www.thelaundress.com/blogs/clean-talk-blog/washing-delicates

Lindsey Boyd, co-founder of The Laundress added: "We are thrilled to join the Unilever family. Together we have a unique opportunity to magnify and accelerate our mission of bringing our eco-friendly, fabric care products to every laundry room in the world."

31.     Defendant also touts its Products on social media as non-toxic, environmentally friendly, and safer, using hastags like #greencleaning, #plantderived, and #ecoconscious to further the message that its Products are non-toxic and offer an environmentally focused cleaning experience.

32.     Defendant's non-toxic, natural ingredient-based, and eco-friendly marketing is echoed on the labeling and websites of the Products Plaintiffs purchased during the Class Period. For example, Laundress Classic Signature Detergent labeling/website states:

Our start-to-finish laundering collection in Classic scent is the ultimate "clean laundry smell," blending lily of the valley and jasmine with sweet musk, sandalwood, and a touch of citrus.

33.     Laundress Scented Vinegar labeling/website states:

Plant-derived formula with no unnecessary additives.

Vinegar is known for its powerful cleansing properties that fight stains, buildup, and odors. However, it's also known for its off-putting "vinegary" smell. Combining our popular No. 247 scent with vinegar, this multipurpose product gets glassware to spar0kle, easily removes bathtub film, effectively tackles messes and odors in the kitchen, and more!

34.     Laundress Fabric Fresh Class labeling/website states:

Keep clothes in rotation! This plant-derived formula adds a crisp, fresh scent to fabrics between washes while removing odor. It's also ideal for deodorizing bedding, outerwear, car interiors, sneakers, and luggage, and works to freshen up closets and drawers, too.

35.     By promoting its Products as non-toxic, eco-friendly, and allergen-free on labeling and in widespread and consistent marketing campaigns, Defendant has been able to position itself as a luxury producer of premium cleaning and laundry products that are safer to use and better for

the environment.

36.     Defendant's marketing has successfully cultivated a loyal customer base of consumers (including Plaintiffs) who seek non-toxic cleaning products and are willing to pay a substantial price premium to obtain non-toxic, supposedly safer cleaning products.

37.     As demonstrated above, during the Class Period, Defendant represented that the Products were safer than alternative cleaning and laundry products and nontoxic, biodegradable, and allergen-free on Product labeling, on its website, on social media, and through other advertising channels.

38.     Defendant's representations were false and/or misleading as incomplete or only partially true. Contrary to Defendant's representations, the Products were not non-toxic or safe due to bacterial contamination and/or the systemic and undisclosed flaws in Product design and manufacturing that made the products unreasonably susceptible and unreasonably at risk of bacterial contamination, a risk that inevitably manifested to Defendant at least as early as January 2021.

39.     Moreover, at least as early as the beginning of the Class Period, Defendant failed to disclose on Product packaging and labeling (including in the ingredients section) or otherwise that the Products contained or were at risk of containing highly dangerous and toxic bacteria, including *Burkholderia cepacia* complex, *Klebsiella aerogenes*, and multiple different species of *Pseudomonas*. Relatedly, Defendant provided no warning or instructions on Product packaging or labeling or otherwise that the Products contained or were at risk of containing highly dangerous and toxic bacteria, including *Burkholderia cepacia* complex, *Klebsiella aerogenes*, and multiple different species of *Pseudomonas*; the risks of bacterial contamination; or the signs and what do if a user suspected an infection.

**B. Life-Threatening Dangers of *Pseudomonas* and the Other Bacteria Identified by Defendant**

40.     In November and December 2022, Defendant admitted that the Products "can contain bacteria, including *Burkholderia cepacia* complex, K*lebsiella aerogene*s and multiple different species of *Pseudomonas*[,]" three highly-dangerous and life-threatening types of bacteria.[4]

41.     *Pseudomonas* contains more than 140 species, with more than 25 species associated with humans. Because of the frequency with which it is involved in human disease, *Pseudomonas aeruginosa* has received the most attention.

42.     *Pseudomonas aeruginosa* is a common encapsulated, gram-negative, aerobic–facultatively anaerobic, rod-shaped bacterium that can cause disease in plants and animals, including humans. *Pseudomonas aeruginosa* can cause severe infections in the blood, lungs, urinary and digestive systems, as well as skin and soft tissue infections, and is of particular concern in the healthcare and post-surgery settings.

43.     *Pseudomonas aeruginosa* exposure, including through inhalation and skin contact, can cause infections (including lung and soft tissue infections), severe illness, and even death.[5] [6] In 2019, the United States Centers for Disease Control and Prevention identified *Pseudomonas aeruginosa* as a serious antibiotic resistant threat. In 2017, for example, antibiotic resistant *Pseudomonas aeruginosa* was responsible for 32,600 estimated cases in hospitalized patients and 2,700 estimated deaths.

---

[4] https://www.thelaundressrecall.com/.

[5] Yohei Migiyami, et al., *Pseudomonas aeruginosa Bacteremia among Immunocompetent and Immunocompromised Patients: Relation to Initial Antibiotic Therapy and Survival*, Jpn J Infect. Dis., 2016; 69(2):91-6, accessible at: https://pubmed.ncbi.nlm.nih.gov/26073727/.

[6] S. Sudharsanam, *Airbone Pseudomonas species in Healthcare Facilities in a Tropical Setting*, Curr Health Sci J.,2015 Apr-Jun; 41(2): 95-103, accessible at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6201198/; *see also* https://www.endosan.com/pseudomonas-aeruginosa-causes-symptoms-transmission-and-infection-prevention

44.     *Pseudomona aeruginosa* poses particular dangers for immunodeficient individuals, that is, individuals whose immune systems' ability to fight infectious diseases and cancer is compromised. Serious infection occurs during existing diseases or conditions due to pernicious traits of the bacterium including the ability to form aggregations commonly known as biofilms, with research indicating that *Pseudomona aeruginosa* can persist on inanimate surfaces for months.[7] The severe risks posed to immunocompromised individuals by *Pseudomona aeruginosa* varies widely, including *Pseudomona aeruginosa* being one of the leading causes of morbidity and death in cystic fibrosis patients.

45.     Antibiotic resistance is one of *Pseudomonas aeruginosa*'s most sinister aspects. In 2017, the World Health Organization ("WHO") listed *Pseudomona aeruginosa* as a priority pathogen, that is, one of twelve antibiotic resistant bacteria that "pose the greatest threat to humanity." WHO's priority pathogen list promotes research and development of new antibiotics to address growing global resistance to antimicrobial medicines, with WHO identifying *Pseudomona aeruginosa* as a "Priority 1: Critical pathogen."

46.     *Burkholderia cepacia* complex, or simply *Burkholderia cepacia*, is a group of catalase-producing, lactose-nonfermenting, Gram-negative bacteria composed of at least 20 different species. Like *Pseudomonas aeruginosa*, *Burkholderia cepacia* is an opportunistic human pathogen that most often impacts the immunocompromised.

47.     *Burkholderia cepacia* causes lung infections, rapid lung decline, and pneumonia, particularly in immunocompromised individuals with underlying lung disease (such as cystic fibrosis or chronic granulomatous disease). *Burkholderia cepacia* can survive for prolonged periods in moist environment; and are often resistant to common antibiotics. Furthermore,

---

[7] Axel Kramer, *How long do nosocomial pathogens persist on inanimate surfaces? A systematic review*, BMC Infect Dis., 2006; 6:130, accessible at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1564025/

*Burkholderia cepacia* displays a remarkable ability to digest oil and some strains of *Burkholderia cepacia* can tolerate high salinity.

48.     *Klebsiella aerogenes*, previously known as *Enterobacter aerogenes*, is a Gram-negative, oxidase negative, catalase positive, citrate positive, indole negative, rod-shaped bacterium. Like the other bacteria contaminating the Products, *Klebsiella aerogenes* is an opportunistic human pathogen that causes various infections, particularly in immunocompromised individuals. Some *Klebsiella* bacteria have become highly resistant to antibiotics, and some can be very difficult to treat, including *Klebsiella aerogenes*.

49.     The nature and intended uses of the Products creates unique infection risks for users, including Plaintiffs. Among other things, Defendant represents the near-ubiquitous cleaning utility of the Products and directs consumers to use various Products together to improve cleaning utility, *i.e.*, Defendant recommends using Delicate Wash Lady laundry detergent in conjunction with Defendant's Wash & Stain Bar, Stain Solution, and Delicate Spray. As a result, users widely spread contaminated Products on their clothes, surfaces, and in the air throughout their homes, substantially increasing the risk that the bacteria will proliferate, as well as substantially increasing the risk of infection through inhalation or skin exposure for users.

**C.     The Products Were at Risk of Bacterial Contamination Due to Systemic and Readily Apparent Design or Manufacturing Issues Long Before Defendant's Recall and Defendant Knew of that Risk**

50.     Defendant is in the unique and superior position of knowing the ingredients and raw materials (as well as the sources and integrity of its ingredients and raw materials) used in manufacturing its Products and possesses unique and superior knowledge regarding the manufacturing process for the Products, the manufacturing process for the ingredients and raw materials in the Products, and the risks associated with those processes, such as the risk of bacterial contamination, including *Pseudomonas* contamination.

51.     Defendant, a top manufacturer of consumer and professional cleaning products, is a sophisticated manufacturer with access to cutting-edge research and technology. As a sophisticated manufacturer, Defendant is acutely aware of potential risks to its manufacturing processes and to the ultimate users of its products. Moreover, Defendant is subject to regulatory and internal quality assurance programs that—when properly implemented—should identify existing and emerging risks to its products and end-users.

52.     The risk that the Products and Defendant's manufacturing process were susceptible to bacterial contamination were readily foreseeable to Defendant long before the Class Period. The risks of bacterial contamination are no secret in the manufacturing industry and have been known and extensively studied in the manufacturing industry long before the contamination at issue in this case.

53.     Generally, all products containing water and organic/inorganic compounds under appropriate physicochemical conditions, are exposed to microbial contamination. Bacteria can be introduced in manufacturing processes due to improper sanitation practices; ingredients that encourage growth of microorganisms; ineffective preservative systems; cross-contamination from ingredients, raw materials, other products or surfaces; contaminated water sources; improper storage in warm, humid environments; container closure system failures; as well as sterilization and biocidal failures. Bacterial contamination can also occur in the absence of preservatives or biocides or where improper or inadequate preservatives or biocides are used.

54.     Bacterial contamination has resulted in product recalls for decades. For instance, an analysis of FDA enforcement reports from 2012 to 2019 found that 87% of recalls for sterile drugs were associated with microbial contamination. In the cosmetic and food manufacturing industries, between 1993 and September 1998, microbial contamination accounted for a total of 1,370 recalls (36% of all products recalled). Likewise, the European Commission's RAPEX

database (which is the EU rapid alert system for unsafe consumer products and consumer protection), identified sixty-two (62) recalls of cosmetic products between 2008 and 2014, with *Pseudomonas aeruginosa* being the most frequent contaminant. In short, bacterial contamination, including *Pseudomonas* bacteria, has been a notable bane to the manufacturing industry for decades and long before the Products were contaminated here.

55.     The risk of bacterial contamination in the Products is even more acute than the omnipresent risk of bacterial contamination in manufacturing generally. Many of Defendant's products are water-based and throughout its promotional materials, Defendant touts that the Products contain the "purest, most ethically viable, natural, raw ingredients—with some blends containing over 20 different essential oils. Selecting plants nurtured in the best environments ensures they release the finest oils. Zestful citrus fruits, precious woods, fragile petals, and pungent spices all give up their prized oils under this craftsman's watchful eye."

56.     *Pseudomonas* and *Klebsiella* are citrate positive, i.e., the bacteria can use citrate as a sole carbon source for its growth. Similarly, *Burkholderia cepacia* digest oils and tolerates high salinity. In turn, the Products contain citrus-based chemicals and contain other ingredients, including essential oils, that greatly promote the growth of *Pseudomonas*, *Klebsiella*, and *Burkholderia cepacia* and other bacteria. In other words, the Products provide a rich medium that favors bacterial growth due to the presence of water and citrus-based and organic/inorganic ingredients that bacteria use as an energy source. That risk is compounded if quality control and antimicrobial measures are not observed (as must have been the case here).

57.     To the extent Defendant's Products do not contain the foregoing ingredients, the Products are at unreasonable risk of cross-contamination from Products' containing the foregoing ingredients due to overlapping manufacturing processes, a cross contamination risk Defendant

should have also been aware of long before the Class Period and the contamination at issue in this lawsuit.

58.     Prior to the Class Period, the risks of bacterial contamination, particularly *Pseudomonas Klebsiella* and *Burkholderia cepacia* contamination, was readily apparent and easily foreseeable or should have been readily apparent and easily foreseeable to Defendant because of the composition and uses of the Products long before the bacterial contamination Plaintiffs challenge in this case.

59.     Defendant was obligated to design the Products to prevent the foreseeable risk of bacterial contamination, including the risk of *Pseudomonas*, *Klebsiella*, and *Burkholderia cepacia* contamination.

60.     Defendant was also required to manufacture the products to prevent the foreseeable risk of bacterial contamination, including by implementing rigorous quality control measures that have long been understood to prevent microbial contamination during manufacturing processes, including:

a.   Design of manufacturing processes that minimize microbial contamination;

b.   Microbial risk assessment of raw materials and finished ingredients;

c.   Development of effective audit checklists for suppliers and Defendant focused on microbial control;

d.   In-person audits of production;

e.   Supplier quality agreements established with a focus on microbial control;

f.   Control of storage conditions in warehouses, during transit, and post-production;

g.   Effective maintenance and hygiene of facilities and equipment;

h.   Effective cleaning of equipment and facilities;

i.   Minimization of contact with humans and control of vermin and insects;

j.   Control of containers used to store and ship materials;

    k.   Control of supply chain, water systems, and wastewater and waste;

    l.   Development of pasteurization or sterilization processes for natural ingredients and raw materials;

    m.  Development of microbial test methods and specifications based on risk assessments; and

    n.   Effective investigation of microbial contamination.

61.    The contamination in this case did not occur overnight or in limited batches or lots of Products. Instead, in November and December 2022, Defendant revealed that Product contamination dated back nearly two years to at least January 2021 with eight (8) million units of Products impacted by potential contamination and that Defendant was "aware of 11 consumers who have reported Pseudomonas infections and [was] investigating these reports to see if there is any connection to the recalled products."

62.    Even though Defendant suggested that the contamination was limited to Products produced after January 2021, Defendant recalled <u>all</u> existing Products, including Products produced prior to January 2021. To confuse and compound matters further, Defendant did not indicate whether pre-January 2021 Products were also at risk of bacterial contamination or why a recall of those Products was necessary.

63.    The duration and scope of the contamination at issue in this case (every existing Product for 250 Product lines) strongly indicates a catastrophic or systemic failure in the Products' design and specifications or Defendant's manufacturing processes (including quality controls) during production during the entire Class Period. Defendant has still not resumed production over four months after Defendant's notified consumers to stop using the Products.

64.    As demonstrated by Defendant's November safety notice and December 2022 recalls (discussed further below), the Products were unreasonably dangerous and unfit for sale due

to a design defect that made the Products susceptible to the readily foreseeable risk of bacterial contamination, including *Pseudomonas*, *Klebsiella*, and *Burkholderia cepacia* contamination.

65. The unreasonable risk of bacterial contamination stemming from the Products' defective design could have been reduced or avoided entirely by adopting a reasonable alternative design, including adding a preservative or antimicrobial or biocidal agent such as isothiazolones, bronopol, aldehydes, and carboxylic acids such as glyoxylic or glycolic acid. Those preservatives and agents are commonly included in household cleaning products to extend the shelf-life of cleaning products, particularly cleaning products like the Products at issue in this case, which are water-based and include ingredients that promote bacterial growth.

66. To the extent the Products already included preservatives or antimicrobial or biocidal agents, the unreasonable risk of bacterial contamination stemming from the Products' defective design could have been reduced or avoided entirely by increasing the amount of preservatives or antimicrobial or biocidal agents; by including alternative preservatives or antimicrobial or biocidal agents; and/or by including a biocidal treatment for raw or finished materials.

67. In the alternative, during the Class Period (as demonstrated by duration and scope of the contamination and Defendant's November and December 2022 safety notice and recalls), the Products were unreasonably dangerous and unfit for sale due to a manufacturing defect that made the Products susceptible to the readily foreseeable risk of bacterial contamination, including *Pseudomonas*, *Klebsiella*, and *Burkholderia cepacia* contamination. The Products deviated from Defendant's design specifications by *inter alia* including contaminated raw materials, water, or other ingredients; improper hygiene; inadequate testing and audit procedures, and/or poor shipping or storage conditions.

68.     Moreover, the duration and scope of contamination raises only two plausible possibilities regarding Defendant's knowledge of the substantial risk of Product contamination from at least January 2021 until November and December 2022. Starting in at least the beginning of the Class Period, Defendant knew and ignored the Products' bacterial contamination (and consumer injury reports indicating bacterial contamination), or knew of and ignored the systemic manufacturing and/or design issues with the Products and their unreasonable susceptibility to bacterial contamination, ignoring or downplaying those risks to prevent a total cessation of production, sales, and to protect the existence of Defendant's business, all at the great expense of consumer health.

69.     Defendant's knowledge, recklessness, and/or conscious misbehavior is further demonstrated by the breadth of its recall and its continuing equivocation and misleading disclosures in implementing the recall. While Defendant suggests that the contamination includes Products produced after January 2021, Defendant has issued a recall of all existing Product (including pre-January 2021 products) without indicating to at-risk consumers whether those Products contain bacteria. Defendant has still not resumed production, indicating a design or manufacturing defect so serious Defendant must have known and ignored that risk at least as early as the beginning of the Class Period.

70.     Moreover, on December 27, 2022, Defendant also disclosed that a "further in-depth review has identified that The Laundress fabric conditioners might contain an impurity (ethylene oxide) at a low level that nonetheless exceeds our internal company standards." The timing of Defendant's second disclosure regarding Product dangers indicates that Defendant may have known of other systemic Product design and/or manufacturing flaws and decided to disclose those risks on December 27, 2022 to soften the impact of a second disclosure regarding Product safety.

22

The suspicious timing of Defendant's second recall announcements further demonstrates knowledge, recklessness, and/or conscious misbehavior.

71.     At least as early as the beginning of the Class Period, Defendant fully understood the substantial and unreasonable risks of contamination inherent in the Products' design or in Defendant's manufacturing processes but chose not to remedy the issue(s) or falsely portrayed that the risk of physical injury was slight to maintain its existence and the status quo even though the costs and viability of remediating Product issues was necessary and reasonable considering the substantial and actual risk of injury to consumers.

72.     Defendant understood that once it revealed that the Products contained bacteria or were at unreasonable risk of bacterial contamination due to pervasive manufacturing and/or design defects, it would have to halt sales and place the existence of its business in question, and Defendant sought to avoid those outcomes by concealing or downplaying bacterial contamination risks that became public in November and December 2022.

73.     Alternatively, starting in at least the beginning of the Class Period, Defendant was grossly negligent (to the point of disregarding substantial risk to human safety and life) in failing to recognize and to prevent bacterial contamination of the Products. The general and specific manufacturing risks of bacterial contamination of the Products, including *Pseudomonas*, *Klebsiella*, and *Burkholderia cepacia* contamination, as well as the methods to prevent bacterial contamination, have been well understood in the manufacturing industry for decades. Defendant could not have reasonably heeded those readily apparent and ascertainable dangers and/or implemented well-recognized methods for preventing those dangers if it unwittingly allowed eight (8) million units of Products to become contaminated with bacteria from at least January 2021 until November 2022.

**D.    Defendant Had a Duty to Disclose to and Warn Plaintiffs and Consumers About the Risk of Bacterial Contamination and Systemic Issues That Made the Products Unreasonably Susceptible to Bacterial Contamination**

74.    From at least the beginning of the Class Period, Defendant had a duty to disclose to, and warn, consumers, including Plaintiffs, of the risk that the Products were contaminated with bacteria; of injury reports indicating bacterial contamination; and/or of the systemic risks in Product design or manufacturing which made the Products unreasonably susceptible to bacterial contamination. Plaintiffs had no reasonable access to this information and relied on Defendant to make prompt and complete disclosure regarding Product risks, particularly prior to purchase.

75.    During the Class Period, Defendant possessed superior knowledge, not discoverable by Plaintiffs, regarding consumer injury reports, bacterial contamination, the substantial risk that the Products were contaminated with bacteria, and/or the systemic and catastrophic flaws in Product design or manufacturing that made the Products unreasonably susceptible to bacterial contamination. During the Class Period, Defendant knew that Plaintiffs and other consumers were purchasing the Products based on Defendant's portrayal of the Products as premium cleaning Products that were non-toxic and environmentally friendly, that did not contain bacteria, and/or were not at an unreasonable risk of bacterial contamination, based on Defendant's representations and Product labeling and packaging and other promotional materials. Defendant had a duty to disclose its superior knowledge of bacterial contamination risks to Plaintiffs but did not disclose that information to wrongly protect its business.

76.    During the Class Period, Defendant made incomplete and false representations that required a corrective and complete disclosure regarding consumer injury reports, bacterial contamination, the substantial risk that the Products were contaminated with bacteria, and/or the systemic and catastrophic flaws in Product design or manufacturing that made the Products unreasonably susceptible to bacterial contamination. Among other things, Defendant represented

on Product labeling, packaging, and in other promotional materials that the Products were "Nontoxic, biodegradable, and allergen-free." However, Defendant failed to disclose consumer injury reports, the Products' bacterial contamination, and the unreasonable risk of bacterial contamination even though the actual circumstances were contrary to Defendant's misleading and incomplete representations regarding Product uses and safety.

77.     Moreover, during the Class Period, based on the duration and scope of the contamination, Defendant must have actively concealed consumer injury reports, bacterial contamination, the substantial risk that the Products were contaminated with bacteria, and/or the systemic and catastrophic flaws in Product design or manufacturing that made the Products unreasonably susceptible to bacterial contamination. A manufacturer in Defendant's position atop of the cleaning product market, and with Defendant's sophistication, must have known of the dangers that the Products were contaminated or at risk of contamination due to the Product design and manufacturing flaws.

78.     Defendant knew that if it disclosed that the Products contained bacteria or were at risk of containing bacteria (including due to systemic Product design and manufacturing defects), Plaintiffs and members of the Classes would not have purchased or used the Products. To selfishly protect its business, Defendant was motivated to conceal the risk of contamination on product packaging or labeling and in other promotional mediums and/or to falsely portray that the risk of contamination was immaterial. Even now, Defendant refuses to clearly disclose the scope of Product contamination and whether pre-January 2021 Products are at risk of bacterial contamination, instead stating that "a broad product withdrawal" was part of Defendant's "renewed commitment to product quality."

79.     Defendant's misrepresentations and omissions were material because consumers are highly concerned with product ingredients and their health and safety and want to know

whether a product is contaminated with bacteria or at risk of bacterial contamination that could cause bodily injury or death.

**E.      In November 2022 and December 2022, Defendant Disclosed the Bacterial Contamination and Recalled the Products**

80.      On November 17, 2022, on its social media pages and through other promotions channels, Defendant issued a safety notice to consumers "to immediately stop using all The Laundress products in your possession." Laundress stated that it "identified the potential presence of elevated levels of bacteria in some of our products that present a safety concern."

81.      On December 1, 2022, Defendant recalled the Products, stating "[t]he recalled products can contain bacteria, including *Burkholderia cepacia* complex, *Klebsiella aerogenes* and multiple different species of *Pseudomonas*." In recalling the Products, Defendant noted "[p]eople with weakened immune systems, external medical devices, and underlying lung conditions who are exposed to the bacteria face a risk of serious infection that may require medical treatment. The bacteria can enter the body if inhaled, or through the eyes or a break in the skin."[8] Defendant stated that it was "aware of 11 consumers who have reported Pseudomonas infections and [was] investigating these reports to see if there is any connection to the recalled products."

82.      On December 27, 2022, Defendant issued a second recall, this time stating, "a further in-depth review has identified that The Laundress fabric conditioners might contain an impurity (ethylene oxide) at a low level that nonetheless exceeds our internal company standards." Upon information and belief, Defendant opportunistically revealed the ethylene oxide contamination believing that the second announcement would be eclipsed by the fallout stemming from Defendant's revelation that the Products were contaminated with life-threatening bacteria.

---

[8]      *See*      https://www.cpsc.gov/Recalls/2023/The-Laundress-Recalls-Laundry-Detergent-and-Household-Cleaning-Products-Due-to-Risk-of-Exposure-to-Bacteria; *see also* https://thelaundressrecall.com/

83.    Defendant ultimately recalled eight (8) million bottles of the Products, encompassing roughly 250 product lines. As of December 2, 2022, "testing has identified bacteria in certain recalled products, including those produced between January 2021 and September 2022." Even though Defendant suggested the bacterial contamination dated back to January 2021, it recalled every existing Product, including those produced prior to January 2021. Defendant did not state whether pre-January 2021 products were at risk of bacterial contamination but, instead, confusingly suggested that it "decided to take additional steps to begin restarting The Laundress with a renewed commitment to product quality by implementing a broad product withdrawal."

84.    Defendant's recall of the Products does not provide an adequate remedy for Plaintiffs and the proposed Classes. As an initial matter, to receive compensation under the recall, consumers are required to have proof of purchase, either proof of direct purchase off Defendant's website, a receipt, and/or a picture of the Product's UPC and date code with initials.  Without proof of purchase, consumers cannot receive a refund, even though many consumers necessarily used and discarded Products based on the duration of the contamination disclosed by Defendant (every existing Product, including Products sold before January 2021).

85.    Likewise, Defendant's recall does not provide compensation to consumers who spent money and time and discarded potentially contaminated property to remediate bacterial contamination, including Plaintiff Geschwind who disposed of hundreds of dollars of potentially contaminated storage containers (among other remediation expenses). Defendant recommends using its cleaning and laundry Products, including on delicate fabric items that cannot be exposed to hot water, intense heat, bleach or other disinfectants that are necessary to kill bacteria. Despite Defendant's recommendation, the recall does not compensate consumers for discarded property, including clothes that cannot be safely worn again, or other remediation expenses.

86.    Defendant also recommended that immunocompromised individuals rewash clothing, suggested methods to clean washers and dryers, and also recommended that "concerned" consumers rewash dishes and surfaces with alternative products. Again, despite its instructions and recommendations, Defendant does not offer compensation for remediation expenses or contaminated property as part of its recall.

87.    Moreover, Defendant's recall does not offer any compensation to consumers like who were either physically injured by the Products or to consumers needing medical monitoring given the persistence and continuing risk of bacterial contamination and infection, including Plaintiffs Ostenfeld and Skilwill (who had already used and been physically injured by the Products prior to the December recalls).

88.    Defendant's November and December 2022 safety notice and Product recalls were inadequate to prevent injury and damages. For consumers like Plaintiffs Ostenfeld and Stillwill who were physically injured prior to the safety notice and recalls, Defendant's attempt to warn of bacterial contamination or the risk of bacterial contamination was too little and too late. For consumers who were physically injured after the safety notice and recall, the channels and means used to convey the safety notice and recalls were either insufficient or too vague to reach at-risk consumers and/or the personal injuries suffered by those consumers were latent manifestations of bacterial infections that began prior to the November/December safety notice and recalls.

89.    Defendant's recall included participation by the CSPC and coincides with the timing and nature of similar recalls of cleaning products manufactured by Defendant's competitors. On October 25, 2023 (roughly three weeks prior to Defendant's safety notice and over a month before its own recall), the CSPC announced a recall by The Clorox Company involving 37 million scented units of its Pine-Sol products produced between January 2021 and September 2022, the same suggested period of the bacterial contamination here. On December 12,

2022, the CSPC announced AlEn USA LLC was recalling 14.5 thousand units of "Art of Green" laundry detergents, including the lavender scented variation. On February 8, 2023, the CSPC announced that Colgate-Palmolive Co. was recalling 4.9 million units of scented multi-purpose Fabuloso cleaners. In recalling the Fabuloso products, Colgate-Palmolive admitted that "Fabuloso is voluntarily recalling some of . . . Multi-Purpose Cleaners made in the United States because a preservative was not added at the intended levels during manufacturing. With inadequate preservative, there is a risk of bacteria growth in the recalled products." Defendant here understood that risk—among many others—long before the Class Period in this case, and long before its December recalls of the Products.

90.     The timing of Defendant's and its competitors' recalls and the intervention of the CSPC is more than a coincidence. Since the end of 2022, fifty (50) million units of primarily scented cleaning products have been recalled for potential bacterial contamination dating back to January 2021 by Defendant and its competitors with CSPC involvement. Defendant has exclusive knowledge regarding the precise source of contamination and when it understood the risk that the Products were contaminated. However, it is highly plausible that in or about November 2022, Defendant understood that it could no longer conceal or downplay the existence and risk of bacterial contamination as well as the widespread design and/or manufacturing issues creating that risk based on the prior and forthcoming recalls of its competitors and/or based on the interaction with the CSPC and/or other regulators. Upon information and belief, Defendant disclosed the bacterial contamination to avoid more severe consequences that would certainly arise if it continued to consciously ignore or conceal the contamination.

F.    **Plaintiffs' Purchases and Product Experience, Reliance on Defendant's Representations and Omissions, and Injuries**

<u>Plaintiff Geschwind</u>

91.    During the Class Period, Plaintiff Geschwind purchased Products that were subject to Defendant's recall contaminated with *Pseudomonas, Klebsiella, and/or Burkholderia cepacia,* including Laundress Classic Signature Detergent, Laundress Stain Solution, Laundress Glass & Mirror Cleaner, and Laundress Baby Detergent. Plaintiff Geschwind was exposed to the misleading representations and omissions enumerated in Section A, *supra*, including representations on Product labeling that the Products were "Nontoxic, biodegradable, and allergen free," as well as omissions regarding bacterial contamination, the risk of bacterial contamination, or the systemic flaws in Defendant's Product design and manufacturing leading to bacterial contamination. Plaintiff Geschwind reviewed and relied on Defendant's representations and omissions when purchasing and using the Products and had no reason to believe the Products were contaminated with bacteria.

92.    After Plaintiff Gerschwind learned that Defendant's Products were contaminated with bacteria or at unreasonably risk of bacterial contamination, Plaintiff Geschwind purchased alternative laundry and cleaning products, rewashed all the laundry in her home, and cleaned out all the closets in her home to remediate a potential bacterial contamination, a costly and time-consuming endeavor. Plaintiff Geschwind also disposed of hundreds of dollars' worth of hangers and containers used to store contaminated clothing.

93.    Had Defendant not made the false and misleading representations and omissions regarding the Products, Plaintiff Geschwind would not have purchased or used the Products, as the Products were worthless and presented severe risks of bodily injury due to contamination of harmful bacteria. Moreover, due to the persistent nature of the bacteria (which can survive on

surfaces for months), Plaintiff Geschwind is still at risk of contamination and infection. Accordingly, Plaintiff Geschwind was injured in fact and lost money because of Defendant's improper conduct, and Defendant's recall does not provide adequate relief for those injuries.

Plaintiff Ostenfeld

94.     During the Class Period, Plaintiff Ostenfeld purchased Products that were subject to Defendant's recall contaminated with *Pseudomonas*, *Klebsiella*, and/or *Burkholderia cepacia*, including Laundress Scented Vinegar. Plaintiff Ostenfeld was exposed to the misleading representations and omissions enumerated in Section A, *supra*, including representations on Product labeling that the Products were "Nontoxic, biodegradable, and allergen free," as well as omissions regarding bacterial contamination, the risk of bacterial contamination, or the systemic flaws in Defendant's Product design and manufacturing leading to bacterial contamination. Plaintiff Ostenfeld reviewed and relied on Defendant's representations and omissions when purchasing and using the Products and had no reason to believe the Products were contaminated with bacteria.

95.     After using Products contaminated with *Pseudomonas*, *Klebsiella*, *and/or Burkholderia cepacia*, Plaintiff Ostenfeld was physically injured by the Products. In late 2021, Plaintiff began experiencing respiratory problems that last for more than a year (including difficulty breathing, wheezing, and congestion, and shortness of breath) and skin irritation requiring medical attention. Plaintiff's injuries occurred prior to Defendant's safety notice and recalls are associated with and were caused by the *Pseudomonas, Klebsiella, and/or Burkholderia cepacia* contamination.

96.     Had Defendant not made the false and misleading representations and omissions regarding the Products, Plaintiff Ostenfeld would not have purchased, used, or been physically

injured by the Products, as the Products were worthless and presented severe risks of bodily injury due to contamination of harmful bacteria. Moreover, due to the persistent nature of *Pseudomonas aeruginosa* (which can survive for months), Plaintiff Ostenfeld is still at risk of contamination and infection. Accordingly, Plaintiff Ostenfeld was injured in fact and lost money because of Defendant's improper conduct.

Plaintiff Stilwill

97.     During the Class Period, Plaintiff Stilwill purchased Products that were subject to Defendant's recall contaminated with *Pseudomonas*, *Klebsiella*, and/or *Burkholderia cepacia*, including Laundress Delicate Wash Lady, Laundress Fabric Fresh Class, and Laundress Fabric & Room Spray Classic. Plaintiff Stilwill was exposed to the misleading representations and omissions enumerated in Section A, *supra*, including representations on Product labeling that the Products were "Nontoxic, biodegradable, and allergen free," as well as omissions regarding bacterial contamination, the risk of bacterial contamination, or the systemic flaws in Defendant's Product design and manufacturing leading to bacterial contamination. Plaintiff Stilwill reviewed and relied on Defendant's representations and omissions when purchasing and using the Products and had no reason to believe the Products were contaminated with bacteria.

98.     In October 2021, Plaintiff Stilwill began having increasingly worse sinus congestion and sinus infections. In February 2022, Plaintiff Stilwill was examined by her primary care physician who prescribed antibiotics and referred Plaintiff Stilwill to an Ear, Nose and Throat ("ENT") specialist. Plaintiff Stilwill's ENT performed a CT scan showing a sinus infection in Plaintiff Stilwill's sphenoid sinuses. Plaintiff's ENT prescribed antibiotics, but those antibiotics were ineffective with Plaintiff Stilwill's severe sinus congestion and infection symptoms persisting. Plaintiff's ENT scheduled surgery to open and drain Plaintiff's sinuses, ultimately

performing that surgery on June 3, 2022. The infection was subsequently cultured and shown to be *Pseudomonas aeruginosa.*

99.     Had Defendant not made the false and misleading representations and omissions regarding the Products, Plaintiff Stilwill would not have purchased, used, or been physically injured the Products, as the Products were worthless and presented severe risks of bodily injury due to contamination of harmful *Pseudomonas*, *Klebsiella*, *and/or Burkholderia cepacia* (as demonstrated by Defendant's recall and Plaintiffs' physical injuries). Moreover, due to the persistent nature of *Pseudomonas aeruginosa* (which can survive for months), Plaintiff Stilwill is still at risk of *Pseudomonas aeruginosa* infection.  Accordingly, Plaintiff Stilwill was injured in fact and lost money because of Defendant's improper conduct.

## CLASS ALLEGATIONS

100.    Plaintiffs seek to represent and certify the following class:

> All United States residents who purchased Products during the Class Period ("Economic Injury Class").[9]

> The Economic Injury Class excludes any judge or magistrate assigned to this case, Defendant, Defendant's officers, directors, legal representatives, successors, and assigns, and any entity in which Defendant has a controlling interest.

101.    Plaintiffs Ostenfeld and Stilwill seek to represent and certify the following class:

> All United States residents who suffered physical injuries after using Products that were purchased during the Class Period ("Physical Injury Class").

> The Personal Injury Class excludes any judge or magistrate assigned to this case, Defendant, Defendant's officers, directors, legal representatives, successors, and assigns, and any entity in which Defendant has a controlling interest.

102.    Plaintiffs satisfy the requirements of Rule 23(a) and Rule 23(b).

---

[9] The Class Period is the statute of limitations for the applicable claims.

103.    <u>Numerosity</u>:  This proposed class action involves eight (8) million contaminated units of Defendant's Products and very likely involves tens of thousands or hundreds of thousands of purchasers or more. Although the exact number of members in the Economic Personal Injury Class and the Personal Injury Class are unknown to Plaintiffs, the number of individuals in the Economic Injury Class and the Personal Injury Class far exceed forty (40) individuals and very likely amount to tens of thousands or hundreds or hundreds of thousands of individuals in the Economic Injury Class and hundreds or thousands of individuals in the Personal Injury Class. As a result, the Economic Injury Class and the Personal Injury Class are so numerous that joinder of all members is impracticable.

104.    The proposed classes are defined by objective criteria so that it is administratively feasible for the Court to determine whether a particular individual is a member. Individual class members can be identified through affidavits and/or reference to documents in Defendant's possession, custody, or control without resort to a mini-hearing on the merits.

105.    <u>Commonality</u>: The questions of law and fact common to the Economic Injury Class and the Personal Injury Class predominate over any questions which may affect individual members of those Classes. Those questions include, but are not limited to:

a.      How Defendant's Products became contaminated with bacteria;

b.      When and how Defendant knew or suspected that the Products were contaminated with bacteria;

c.      Whether the Products designed, manufactured, and labeled by Defendant containing bacteria were safe for their intended use;

d.      Whether the Products' violated minimum consumers' minimum safety assumptions by being contaminated with bacteria;

e.      Whether the foreseeable risks of Products contaminated with bacteria exceeded the benefits associated with Products contaminated with bacteria;

f.      Whether the foreseeable risks posed by the Products contaminated with bacteria, could have been avoided or reduced through a reasonable alternative design of the Products; and

g.      Whether the Products deviated from design specifications or formulation by including bacteria;

h.      Whether Defendant knew or should have known about the risk that the Products were contaminated with bacteria or were at risk of contamination due to systemic design defect and manufacturing issues;

i.      Whether Defendant adequately warned consumers of the foreseeable danger that the Products contained bacteriaas well as the risk of contamination due to systemic design defect and manufacturing issues;

j.      Whether Defendant made false and/or misleading statements and omissions concerning the Products and the risks associated with those Products and whether those statements and omissions had a consumer-oriented impact and were likely to mislead a reasonable consumer acting reasonably

k.      Whether Plaintiffs and the Class are entitled to actual and compensatory damages, statutory damages, and medical monitoring.

80.    <u>Typicality</u>: Plaintiffs' claims are typical of those belonging to members of the Classes. Each Plaintiff purchased worthless Products containing or at risk of containing *Pseudomonas*, *Klebsiella*, *and/or Burkholderia cepacia* and suffered economic injury as a result. Moreover, Plaintiffs Ostenfeld and Stilwill used Products and suffered physical injuries as a result, including respiratory and skin injuries commonly associated with *Pseudomonas, Klebsiella, and/or Burkholderia cepacia*.

81.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Economic Injury Class, and Plaintiffs Ostenfeld and Stilwill will adequately protect the interests of the Personal Injury Class. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs and their chosen counsel have no interests adverse to those of the Classes that they seek to represent.

Rule 23(b)(1)

82.     Class action status is warranted under Rule 23(b)(1)(A). Prosecuting separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant.

80.     Class action status is also warranted under Rule 23(b)(1)(B). Prosecuting separate actions by individual members of the Classes would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

Rule 23(b)(3)

81.     Common questions of law and fact exist as to every member of the Classes and predominate over any questions solely affecting individual members of the Classes, including the common questions identified above.

82.     New York has the greatest interest in the subject matter of this lawsuit and New York law applies. To the extent the laws of other states apply, there is no material difference in the laws of those states that would impact the adjudication of the claims of the Economic Injury Class or the Physical Injury Class.

83.     A class action is also superior to other available means for the fair and efficient adjudication of this controversy for other reasons. The injuries suffered by individual members of the classes, though important to them, are relatively small compared to the burden and expense of individual prosecution needed to address Defendant's misconduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents

far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Individual class member's interests in individually controlling the prosecution of separate actions are outweighed by their interest in efficient resolution by a single class action, and it would be desirable to concentrate in this single venue the litigation of all class members who were induced to purchase and use the contaminated Products and were injured by Defendant's uniform conduct.

Rule 23(c)(4)

84.    Alternatively, to the extent that class certification under Rule 23(a) and (b) cannot be obtained (which cannot be determined at this stage of the case), the following issues of fact or law are common to all members of the Classes and can be resolved on behalf of the Economic Injury Class and Personal Injury Class through Rule 23(c)(4):

a.    How Defendant's Products became contaminated with bacteria;

b.    When and how Defendant knew or suspected that the Products were contaminated with bacteria;

c.    Whether the Products designed, manufactured, and labeled by Defendant containing bacteria were safe for their intended use;

d.    Whether the Products' violated minimum consumers' minimum safety assumptions by being contaminated with bacteria;

e.    Whether the foreseeable risks of Products contaminated with bacteria exceeded the benefits associated with Products contaminated with bacteria;

f.    Whether the foreseeable risks posed by the Products contaminated with bacteria, including could have been avoided or reduced through a reasonable alternative design of the Products; and

g.    Whether the Products deviated from design specifications or formulation by including bacteria;

h.    Whether Defendant knew or should have known about the risk that the Products

were contaminated with bacteria or were at risk of contamination due to systemic design defect and manufacturing issues;

i. Whether Defendant adequately warned consumers of the foreseeable danger that the Products contained bacteria as well as the risk of contamination due to systemic design defect and manufacturing issues;

j. Whether Defendant made false and/or misleading statements and omissions concerning the Products and the risks associated with those Products and whether those statements and omissions had a consumer-oriented impact and were likely to mislead a reasonable consumer acting reasonably

k. Whether Plaintiffs and the Class are entitled to actual and compensatory damages, statutory damages, and medical monitoring.

85. Plaintiffs cannot be certain of the form and manner of proposed notice to members of the Classes until the Classes are finally defined and discovery is completed regarding the identity of class members. Plaintiffs anticipate, however, that notice by mail will be given to members of the Classes who can be identified specifically. In addition, notice may be published in appropriate publications, on the internet, in press releases and in similar communications in a way that is targeted to reach members of the Classes.

86. Plaintiffs reserve their right to modify or amend the definition of the proposed Classes at any time before the Classes are certified by the Court.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW §§ 349-50 ("GBL")**

87. Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

88. Plaintiffs bring this claim on behalf of themselves and the Economic Injury Class.

89. NYGBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." N.Y. Gen. Bus. Law § 349.

90.     NYGBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [New York.]"

38.     N.Y. Gen. Bus. Law § 350-a (1) defines "false advertising:"

> The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.

91.     The New York Court of Appeals has indicated that New York consumer protection statutes should be liberally construed to provide "needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in our State." *Karlin v. IVF America, Inc.*, 690 N.Y.S.2d 495, 498 (N.Y. 1999).

92.     A violation of NYGBL §§ 349-50 occurs where: (1) the challenged transaction was "consumer-oriented;" (2) a defendant engaged in deceptive or materially misleading acts or practices likely to deceive a reasonable consumer acting reasonably under the circumstances; and (3) the plaintiff was injured by reason of the defendant's deceptive or misleading conduct. The standard for recovery under NY GBL § 350, while specific to false advertising (including labeling), is otherwise identical NY GBL § 350.

93.     The misconduct alleged in the Complaint was consumer oriented. During the Class Period, Defendant sold eight (8) million units of Products contaminated with bacteria or at unreasonable risk of bacterial contamination, directly on its website and/or through online and physical retailers. Moreover, Defendant's false and misleading representations and omissions were directed to the targeted consumers on a broad scale.

94.     Defendant's false and misleading labeling and promotion of the Products, as well as the omissions and non-disclosures, constitute deceptive or materially misleading acts or practices likely to deceive a reasonable consumer acting reasonably under the circumstances,

including Plaintiffs and the Economic Injury Class. Defendant's false and misleading labeling and promotion of the Products, as well as the omissions and non-disclosures, also constitute false advertising for purposes of NY GBL § 350.

95.     At least as early as the beginning of the Class Period, Defendant—as a sophisticated and prominent manufacturer of cleaning products—understood that the Products were contaminated, were at unreasonable risk of bacterial contamination and/or that systemic inadequacies in the Products' design and manufacturing processes made the Products unreasonably susceptible to bacterial contamination. Moreover, Defendant received consumer injury reports further demonstrating that the Products were unreasonably dangerous and contaminated with bacteria or at an undue risk of bacterial contamination.

96.     At least as early as the beginning of the Class Period, Defendant consciously ignored those risks and/or intentionally and fraudulently downplayed and falsely minimized those risks to reduce costs, induce substantial purchases by unsuspecting consumers, prevent a steep decline or total cessation in sales, protect Defendant's existence as a going concern, and greatly inflate revenue and profits. Defendant could not have unwittingly produced eight (8) million units of potentially contaminated products for at least a two-year span considering its sophistication and the readily foreseeable nature of the risk of bacterial contamination and well-understood antimicrobial measures in manufacturing.

97.     During the Class Period, Defendant widely represented on Product labeling and its website and ratified and endorsed representations made by other retailers (including online retailers) that the Products had utility as cleaning and laundry Products; were natural, environmentally friendly and cruelty-free, and that the Products were "Nontoxic, biodegradable, and allergen-free." Those representations were false and or misleading because, during the Class

Period, the Products were contaminated with bacteria or were at unreasonable risk of bacterial contamination based on known design and manufacturing defects and could not be used for any purpose. Defendant's misrepresentations and partial truths were material because they related to Product uses and consumer health.

98.     Alternatively, Defendant's representations although technically true had a capacity to mislead consumers because although the Products could be used for cleaning and laundry purposes, the Products could only be used in for cleaning with an attendant and unreasonable risk to consumer health. Defendant's misrepresentations and partial truths were material because they related to Product uses and consumer health.

99.     Defendant's omissions/non-disclosures are also material and actionable under GBL §§ 349-50. Defendant alone possessed material information about consumer injury reports, bacterial contamination, and/or systemic Product design and manufacturing defects that rendered the Products unreasonably susceptible to bacterial contamination. Despite its knowledge, Defendant failed to disclose those risks to Plaintiffs and the Economic Injury Class during the Class Period.

100.    Defendant's omissions were contrary to representations already made and/or Defendant had a duty to disclose the risks of bacterial contamination because: (a) Defendant had exclusive knowledge of those material risks not known to Plaintiffs, and Plaintiffs could not have reasonably learned of those risks; (b) Defendant actively concealed those risks from Plaintiffs, including on packaging and product labeling; and (c) Defendant made partial representations regarding the Products while suppressing material facts concerning the Products' bacterial contamination or risk of bacterial contamination, rendering Defendant's partial representations

materially misleading. Defendant's omissions/non-disclosures were material because they related to Product uses and consumer health.

101.    Defendant's deceptive or materially misleading acts or practices under NY GBL §§ 349-50 proximately caused damage to Plaintiffs and Economic Injury Class Members. Defendant leveraged its deception to induce Plaintiffs and the Economic Injury Class to purchase products that were of lesser value and quality than advertised. Plaintiffs and the Economic Injury Class reviewed and relied on Defendant's representations and omissions and were denied the benefit of the bargain when they decided to purchase the Products over competitor products which do not contain bacteria (or at risk of containing bacteria) and were safe to use.  Had Defendant not made false and misleading statements and used false and misleading advertising tactics, Plaintiffs and the Economic Injury Class would have paid far less than what they did for the Products or would have not purchased the Products at all.

102.    The foregoing acts and practices have detrimentally impacted competition and caused substantial harm to Plaintiffs, the Economic Injury Class, and the consuming public. Plaintiffs and members of the Economic Injury Class were misled and suffered injuries and lost money or property as a direct and proximate result of Defendant's unlawful business practices.

103.    Thus, under NY GBL § 349(h) and NY GBL 350-e, Plaintiffs are entitled to recover their actual damages or statutory (including statutory damages based on Defendant's willful or knowing violations), whichever is greater, along with reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**STRICT PRODUCTS LIABILITY: DESIGN DEFECT**

104.    Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

105.    All Plaintiffs except Plaintiff Geschwind assert this claim on behalf of themselves

and the Personal Injury Class.[10]

106.    Defendant is the manufacturer, distributor, and/or seller of the Products.

107.    A manufacturer, distributor, or seller may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product, including injuries caused by a design defect that renders the product unreasonably dangerous for its intended use.

108.    A design defect exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective under the consumer expectation and/or risk-utility test.

Consumer Expectation Test

109.    The Products' design fails the consumer expectation test, which requires a product to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

110.    Here, the facts permit an inference that Plaintiffs could form minimum safety assumptions about the Products, including that the Products were safe and not contaminated with bacteria and would not cause bacterial infections and other related injuries when used for their intended cleaning purposes.

111.    The Products did not meet Plaintiffs' safety expectations. Although the Products are designed for repeated use and for generally applicable cleaning and laundry purposes throughout the home, contain water and other ingredients that promote bacterial growth (including organic ingredients, citrus-based ingredients, and essential oils that promote bacterial growth), the

---

[10] The Court should not conduct a choice of law analysis at this early stage of the case. However, if the Court conducts a choice of law analysis and determines that Plaintiffs Ostenfeld and Stillwell's claims are governed by the substantive law of their home-states (New Jersey and Nebraska), then Plaintiff Ostenfeld brings her product liability claims pursuant to the New Jersey Products Liability Act.

Products did not contain a preservative or biocidal or antimicrobial agent; contained inadequate amounts of preservatives or biocidal or antimicrobial agents; contained an inadequate preservative profile; and/or lacked biocidal treatment of raw materials, ingredients or finished Products.

112.    The use of preservatives and biocidal or microbial agents and treatments are ubiquitous throughout the cleaning product industry, promote shelf-life, product integrity, and prevent bacterial contamination. The use of preservatives and biocidal or microbial agents or treatments do not alter the composition of cleaning products and are economically feasible and necessary considering the risks posed by product contamination and degradation.

Risk-Benefit Test

113.    The Products' design fails the risk-benefit test. A product is defective under the risk-benefit test if the plaintiff demonstrates that the product's design proximately caused his injury and that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such a design. The relevant factors include: the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

114.    Plaintiffs used the Products as intended and as Defendant directed for cleaning and laundry purposes and suffered bacterial infections and related injuries due to the Products' bacterial contamination.

115.    In light of the relevant factors, on balance, the benefits of the challenged design (one without preservatives/biocidal/antimicrobial agents) far outweigh the risk of danger inherent in such design, including the gravity of the danger posed by the risk of bacterial contamination; the inevitability that bacterial contamination would occur given that the Products include water

and other ingredients that promote bacterial growth and are manufactured in environments that promote bacterial growth; the mechanical and economic feasibility of including preservatives/antimicrobial/biocidal agents and treatments; the low financial cost of an improved design; and the total lack of adverse consequences to the Products and consumers that would result from an alternative design.

Reasonable Alternative Design

116.   The unreasonable risk of bacterial contamination stemming from the Products' defective design could have been reduced or avoided entirely by the adoption of a reasonable alternative design, including the addition of a preservative or antimicrobial or biocidal agent such as isothiazolones, bronopol, aldehydes, and carboxylic acids such glyoxylic or glycolic acid. Those preservatives and agents are commonly included in household cleaning products to extend the shelf-life of cleaning products, particularly cleaning products like the Products at issue in this case which are water-based and include ingredients and are manufactured in environments that promote bacterial growth.

117.   The Products' design defect (the lack of preservatives/biocidal/microbial agents or treatments and unreasonable susceptibility to bacterial contamination) existed when the Products left Defendant's hands, and Plaintiffs did not alter or modify the Products and used the Products as directed and in a reasonably foreseeable manner and suffered injuries, including bacterial infections and related injuries due to the Products' bacterial contamination.

118.    The Products' design defect proximately caused and were a substantial factor in causing Plaintiffs' injuries. Further, Defendant's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

119.   Plaintiffs suffered harm and injuries due to Defendant's misconduct in an amount

to be determined at trial.

### THIRD CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY: MANUFACTURING DEFECT

120.     Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

121.     All Plaintiffs except Plaintiff Geschwind assert this claim on behalf of themselves and the Personal Injury Class.[11]

122.     Defendant is the manufacturer, distributor, and/or seller of the Products.

123.     A manufacturer, distributor, or seller may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product, including an injury caused by a manufacturing defect.

124.     A manufacturing or production defect occurs when a product is manufactured in a substandard fashion or when a product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line. The "manufacturing defect" theory posits that a suitable design is in place, but that the manufacturing process has in some way deviated from that design, rendering a product that is ordinarily safe dangerous so that it causes harm.

125.     Here, at the time the Products left Defendant's hands, the Products deviated from Defendant's intended result/design/specifications or deviated from other seemingly identical models, in one or more of the following ways:

      a.  The Products contained contaminated raw materials, water or other ingredients leading to bacterial contamination;

---

[11] The Court should not conduct a choice of law analysis at this early stage of the case. However, if the Court conducts a choice of law analysis and determines that Plaintiffs Ostenfeld and Stillwell's claims are governed by the substantive law of their home-states (New Jersey and Nebraska), then Plaintiff Ostenfeld brings her product liability claims pursuant to the New Jersey Products Liability Act.

b.  The Products and/or their constituent ingredients were cross contaminated by human or animal contact or raw materials, water or other ingredients leading to bacterial contamination;

c.  The Products' manufacturing and storage facilities were not kept sufficiently clean or were subjected to improper or inadequate hygiene techniques, leading to bacterial contamination;

d.  The Products were subject to inadequate or improper quality control, testing, and/or audit procedures, leading to bacterial contamination;

e.  The Products were subject to inadequate or improper shipping or storage conditions, leading to bacterial contamination; and/or

f.  The Products did not contain or receive the adequate or intended amount of preservatives/antimicrobial/or biocidal agents or treatment or contained or received an improper or inadequate preservative/biocidal/antimicrobial profile.

83.    At this early stage, Plaintiffs cannot be sure of the precise design or manufacturing defect that led to the Products' bacterial contamination because the design and manufacturing process is uniquely within the knowledge and control of the Defendant as manufacturer, distributor, or seller. However, under no circumstances should the Products have been contaminated with bacteria, and it is certain that the Products suffered from a manufacturing and or design defect because they were contaminated with bacteria; caused Plaintiffs' injuries; and were recalled by Defendant due to safety concerns. Discovery will ultimately reveal the precise nature of the Products' design or manufacturing defect, but Defendant cannot avoid liability because it alone possesses knowledge and evidence of the source of the Products' contamination.

84.    The Products' manufacturing defect existed when the Products left Defendant's hands, and Plaintiffs did not alter or modify the Products.

85.    Plaintiffs used the Products as directed and in a reasonably foreseeable manner and suffered injuries, including bacterial infections and related injuries due to the Products' manufacturing.

86.     The Products' manufacturing defect proximately caused and were a substantial factor in causing Plaintiffs' injuries, including bacterial infections and related injuries due to the Products' bacterial contamination. Further, Defendant's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

126.     Plaintiffs suffered injuries and harm because of Defendant's misconduct in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY:
### FAILURE TO PROVIDE ADEQUATE WARNING

127.     Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

128.     All Plaintiffs except Plaintiff Geschwind assert this claim on behalf of themselves and the Personal Injury Class.[12]

129.     Defendant is the manufacturer, distributor, and/or seller of the Products.

130.     A manufacturer, distributor, or seller may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product, including an injury caused by failure to warn or provide adequate instructions.

131.     A product may be defective because of the absence of an adequate warning of the dangers inherent in its use. A Product may be found defective within the general strict liability rule and its manufacturer or supplier held strictly liable because of the failure to provide an adequate warning or instruction where the manufacturer knew or should have known of the risk at the time

---

[12] The Court should not conduct a choice of law analysis at this early stage of the case. However, if the Court conducts a choice of law analysis and determines that Plaintiffs Ostenfeld and Stillwell's claims are governed by the substantive law of their home-states (New Jersey and Nebraska), then Plaintiff Ostenfeld brings her product liability claims pursuant to the New Jersey Products Liability Act.

of manufacturer.

132.    Whether a warning is adequate depends on several factors, among them the normal expectations of the consumer as to how a product will perform, degrees of simplicity or complication in its operation or use, the nature and magnitude of the danger to which the user is exposed, the likelihood of injury, and the feasibility and beneficial effect of including a warning.

133.    Here, Defendant knew of or should have known of the risk that the Products were contaminated with bacteria or were at risk of bacterial contamination based on systemic flaws in Product design or manufacturing. Manufacturers have well-understood the risks of bacterial contamination, including *Pseudomonas*, *Klebsiella*, *and/or Burkholderia cepacia* contamination, for decades and long before the Products were contaminated by bacteria in this case.

134.    Similarly, manufacturers have well-understood the product design features and manufacturing methods that prevent bacterial contamination for decades and long before the Products were contaminated by bacteria in this case, as well as the increased risk of bacterial contamination when proper design features and manufacturing methods are not implemented (as occurred here).

135.    Defendant is one of the foremost manufacturers of cleaning and laundry products in the United States and, at that the time of Products manufacture, knew of the contamination risks that ultimately and inevitably manifested in the Products in (at least) January 2021.

136.    The risk that the Products were contaminated or at risk of bacterial contamination due to inadequate Product design and manufacturing methods presented a substantial danger to Plaintiffs and other consumers when the Products were used in an intended or reasonably foreseeable way, including for cleaning purposes, and reasonable consumers, including Plaintiffs, would not have recognized those potential risks and had no reason to know of those potential risks.

137.    The Products manufactured, distributed, and/or sold by Defendant were defective due to inadequate warnings or instructions because Defendant knew or should have known, at the time of manufacturer, distribution, or sale that the Products created significant risks of serious bodily harm to consumers, but Defendant failed to adequately warn consumers of such risks, including warnings that:

    a.  The Products were contaminated with bacteria;

    b.  The Products were at unreasonable risk of being contaminated with bacteria due to deficiencies in Product design and manufacturing methods and reports from other consumers or competitors; and

    c.  Potential signs of bacterial infection and what to do if a bacterial infection or contamination was suspected, including to stop using the Products immediately and consult a doctor.

138.    Defendant's inadequate or absence of the foregoing warnings and directions a were a substantial factor in causing injuries to Plaintiffs and the Physical Class. Plaintiffs and the reviewed Product labeling and instructions and used the Products as directed without any knowledge the Products were at risk of bacterial contamination and could case their injuries because Defendant did not include any warnings or instructions regarding those risks. Plaintiffs and the Physical Injury Class would not have purchased or used the Products had Defendant included proper warnings and instructions on the risks of bacterial contamination.

139.    The Products' failure to warn or properly instruct on the risks of bacterial contamination proximately caused and were a substantial factor in causing Plaintiffs' injuries, including infections and related injuries stemming from the Products' bacterial contamination. Further, Defendant's actions and omissions as identified in this Complaint constitute a flagrant disregard for human life.

140.    Plaintiffs suffered injuries and harm because of Defendant's misconduct in an

amount to be determined at trial.

## JURY DEMAND

141.    Plaintiffs demand a trial by jury on all issues.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray for

judgment as follows:

(a)     Declaring this action to be a proper class action and certifying Plaintiffs as the representatives of the Economic Injury Class and the Physical Injury Class under Rule 23 of the Federal Rules of Civil Procedure;

(b)     An Order requiring Defendant to establish a medical monitoring protocol for Plaintiffs and the Economic Injury Class and the Physical Injury Class to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to *Pseudomonas*, *Klebsiella*, *and/or Burkholderia cepacia*;

(c)     Awarding actual and statutory damages and compensatory damages;

(d)     Awarding Plaintiffs and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, experts, and reimbursement of Plaintiffs' expenses; and

(e)     Granting such other and further relief as the Court may deem just and proper.

Dated: March 22, 2023

SQUITIERI & FEARON, LLP

By: */s/ Stephen J. Fearon, Jr.*
Stephen J. Fearon, Jr.
Paul V. Sweeny
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: Stephen@sfclasslaw.com
Email: Paul@sfclasslaw.com

ATTORNEYS FOR PLAINTIFFS